**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SACHA B. DAUGHERTY,                                Case No. 1:16-cv-898

               Plaintiff,                        Dlott, J.
                                                  Bowman, M.J.
    v.


COMMISSIONER OF SOCIAL SECURITY,

               Defendant.


**REPORT AND RECOMMENDATION**

Plaintiff Sacha Daugherty filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents five claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED, because it is not supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

On August 7, 2012, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning February 1, 2010, based on rheumatoid arthritis, depression and anxiety. After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ"). On April 24, 2015, she appeared

with counsel[1] and gave testimony before ALJ Elizabeth Motta; a vocational expert also testified. (Tr. 36-66). On July 30, 2015, ALJ Motta issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 12-29).

Plaintiff was 34 years old on the date her alleged disability began, and had turned 40 years old (still within the younger individual category) by the time of the ALJ's decision. She has a high school education with some college, and past relevant work as a cahier/checker, head waitress, and waitress, all of which were semi-skilled or skilled positions performed at the light level of exertion.

Despite an alleged onset date of February 2010, the ALJ determined that Plaintiff did not have any severe impairments prior to April 27, 2011. As of that date, the ALJ determined she had developed severe impairments that included "rheumatoid arthritis, depressive disorder, generalized anxiety disorder, and panic attacks with agoraphobia." (Tr. 14). None of those impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 16). Instead, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform work at a light level,

> subject to the following additional limitations: (1) standing and walking limited to a combined total of four hours during an 8-hour workday; (2) occasional postural activities, such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; (3) no climbing of ladders, ropes, or scaffolds; (4) occasional overhead reaching bilaterally; (5) handling and fingering limited to frequent bilaterally; (6) no exposure to extreme cold, heat, wetness, or humidity; (7) simple, repetitive tasks; (8) low stress work, which is defined as no strict production quotas or fast pace and only routine work with few changes in the work setting; (8) no contact with the public as part of job duties; and (8) occasional contact with coworkers and supervisors.

---

[1]Plaintiff was represented by Jeffrey Casper at her hearing, but is represented by James Roy Williams in this Court.

(Tr. 20).   Based upon her mental limitations, Plaintiff could not perform any of her past work after April 27, 2011.   Nevertheless, the ALJ determined that she remained capable of performing approximately 500,000 unskilled jobs that exist in the national economy, including the representative occupations of inspector, sorter, and mail clerk at the light exertional level, and an additional 200,000 jobs at the sedentary level, including sedentary sorter, sedentary inspector, and document preparer.  (Tr. 28).  Therefore, the ALJ concluded that Plaintiff is not under a disability.   The Appeals Council denied review, leading Plaintiff to file this judicial appeal.

In her Statement of Errors, Plaintiff argues that the ALJ erred by: (1) giving insufficient weight to a treating rheumatologist regarding her physical limitations; (2) rejecting a consulting physician's limitation on social interaction; (3) giving insufficient weight to a treating psychiatrist regarding her mental limitations; (4) improperly assessing Plaintiff's credibility; and (5) failing to include additional limitations in the hypothetical posed to the VE.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported

by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v.  Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

4

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B. Plaintiff's Claims of Error

Plaintiff's first claim of error focuses on the ALJ's evaluation of her physical impairments from rheumatoid arthritis, while her second and third claims focus on the evaluation of her mental impairments. In a fourth claim, Plaintiff is critical of the ALJ's credibility assessment. Plaintiff's fifth claim is an amalgamation of the first four; she alleges additional physical and mental limitations should have been included in a hypothetical question posed to the VE.

The undersigned finds the facts and legal issues presented in this case to be relatively close. An argument could be made that substantial evidence in the record as a whole supports the ultimate decision that the Plaintiff was not under a disability during the period at issue, although an argument also could be made that substantial evidence supports a contrary conclusion. Ordinarily, courts will affirm in such cases. *See Felisky v. Bowen*, 35 F.3d at 1035. However, in this case, several errors made by the ALJ were so critical and pervasive that remand for additional review is required.

## 1. Physical Limitations and Treating Physician Dr. Alappatt

Plaintiff first claims that the ALJ erred by not adopting all of the physical RFC limitations endorsed by Chacko Alappatt, M.D., with whom Plaintiff began treating for her rheumatoid arthritis on May 17, 2011. In contrast to the physical RFC form

completed by Dr. Alappatt, non-examining consultants opined that Plaintiff remained capable of work at the medium exertional level, with few restrictions.[2]

The ALJ alone is responsible for determining a Plaintiff's RFC. *See* 20 C.F.R. § 404.1546(d). At the same time, the relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician. *Id.*

Dr. Alappatt completed a physical RFC form on April 9, 2013, in which he stated that Plaintiff had reduced grip strength, episodic pain and swelling in her left hand and left ankle, episodes of joint swelling and other symptoms. (Tr. 533). He opined that Plaintiff can sit for only one hour and stand for one and two hours at a time (both numbers are circled on the form). (Tr. 534). Dr. Alappatt indicated further that Plaintiff could sit for "about two hours" and stand/walk for "about two hours," although he also stated that Plaintiff could sit for "about four hours." (Tr. 535). He stated that she must walk around for five minutes every sixty minutes, and that she would require a job that permitted her to shift positions at will between sitting, standing and walking. (*Id.*) He opined that Plaintiff would need unscheduled breaks for 5-10 minutes every 1-2 hours, but did not believe she had any need to elevate her legs during "prolonged sitting." (Tr.

---

[2]For reasons that are unclear to the undersigned, the consulting physicians appear to have designated Dr. Alappatt as a "non-treating source." (Tr. 93).

535). He stated that she could "rarely" lift "less than 10 pounds," and "never" lift 10 pounds or more. (*Id.*) He believed her capable of "frequently" being able to climb stairs, but stated she could only "occasionally" twist, stoop, crouch, or climb ladders. (Tr. 536). He endorsed "significant limitations with reaching, handling, or fingering," but left blank queries about the percentage of time that Plaintiff might be able to reach, grasp, twist or turn objects, or use her fingers. (*Id.*) He also opined that she would be absent more than four days per month. To a query about Plaintiff's ability to handle stress, he responded that Plaintiff remained capable of "low stress jobs." (Tr. 534).

The ALJ examined Dr. Alappatt's clinical records in search of support for his many work-preclusive opinions. Having reviewed the same records, the undersigned finds no reversible error in the ALJ's decision to give Dr. Alappatt's physical RFC opinions "moderate weight."

On April 27, 2011, Plaintiff underwent rheumatoid factor testing. Dr. Alappatt subsequently found some nail pitting on physical examination, but otherwise a full and painless range of motion with no other signs of functional impairment. On May 31, 2011, he found crepitus in both knees, as well as tenderness in Plaintiff's wrists and left second MCP joint. Based on lab tests and physical findings, Dr. Alappatt confirmed a diagnosis of rheumatoid arthritis and prescribed a medication regimen of Methotrexate and Prednisone on May 31, 2011. Soon after, on August 2, 2011, Dr. Alappatt reported that Plaintiff was doing "quite well" on her medications, (Tr. 437). By August, she was reporting only minimal pain in her left wrist, which she rated "as a 1/10 on average." She denied any morning stiffness or other symptoms. (Tr. 435). Dr. Alappatt's subsequent physical examination records from 2011 through 2013 consistently reflect that Plaintiff continued to do well, with minimal clinical findings other than crepitus in both knees and

occasional and slight tenderness in several MCP joints, but no other abnormalities. (Tr. 15).

On September 24, 2013, Plaintiff reported doing well with no abnormal clinical findings noted, although Plaintiff reported posterior cervical and trapezius area pain. On March 7, 2014, Dr. Alappatt recorded Plaintiff's complaints of myofascial pain in her cervical spine, but no clinical abnormalities consistent with rheumatoid arthritis, which he noted was under "excellent" control. (Tr. 15). Cervical spine x-rays taken on November 22, 2013 revealed some straightening of the lordotic curve due to positioning or spasm, but no other abnormality. (*Id.*) On July 18, 2014, Plaintiff reported diffuse pain with no swelling, but said she did not go to pain management and reported that she thought she was under good control. Dr. Alappatt noted no clubbing, evidence of joint synovitis, or other deformity, despite Plaintiff's complaints of tenderness in the posterior cervical and trapezius, particularly over her left sternocleid/mastoid area. VECTRA testing again confirmed low rheumatoid activity and on January 20, 2015, Plaintiff reported "doing better" with no swelling, despite continued reports of "diffusely" felt pain. (Tr. 15).

Based on Dr. Alappatt's consistent records of good to excellent control with medication treatment and "mild, at worst" clinical findings, (Tr. 15), the ALJ found no evidence that Plaintiff's rheumatoid arthritis met or equaled any listed impairment. (Tr. 16). In addition, the ALJ found:

> The degree of alleged pain and functional limitation is inconsistent with the rather mild objective and clinical findings related to this condition. The claimant alleged significant difficulty using her hands for such tasks as opening bottles and using buttons and zippers. However...physical examinations by Dr. Alappatt noted only periodic, and slight and subjective, tenderness in several MCP joints with no evidence of swelling, stiffness, or other abnormalities in the upper extremities. Further, VECTRA testing confirmed a very low degree of rheumatoid activity.

Those minimal findings are not consistent with the claimant's reported minimal activity level. In addition, these findings are inconsistent with significant limitations in lifting and carrying, or her reported inability to sit for more than 30 minutes at a time, or the need to lie down for most of the day (See, Testimony). Further, the claimant alleged that she must elevate her legs due to swelling, but Dr. Alappatt has consistently reported that he does not observe swelling. Dr. Alappatt's examinations are generally benign with no more than minimal crepitus noted in the knees at times. In fact, the most remarkable finding contained in Dr. Alappatt's records are the claimant's subjective complaints of swelling, although he specifically noted no swelling, and her subjective allegations of diffuse and severe joint pain in multiple areas.

(Tr. 21).

Despite "essentially normal physical examinations," the ALJ restricted Plaintiff to the "light" exertional level, giving "some benefit of doubt to the claimant's subjective complaints." (Tr. 21). Thus, although the ALJ did not find Dr. Alappatt's work-preclusive RFC opinions to be supported, neither did she find persuasive the opinions of consultants who believed Plaintiff remained capable of medium level work. She gave the consulting opinions "no more than slight weight" "in light of the nature and chronicity of the claimant's rheumatoid arthritis." (Tr. 24). The ALJ also restricted Plaintiff to no more than occasional overhead reaching and no repetitive or constant handling or fingering. (Tr. 21).

The ALJ explained why she did not believe Plaintiff's rheumatoid arthritis caused her to have the disabling level of functional limitations endorsed by Dr. Alappatt:

[T]he claimant's allegations of pain and other symptoms are far in excess of mild clinical and objective findings of record…. She alleges marked physical pain, but Dr. Alappatt does not relate her complaints [to] rheumatoid arthritis, which is appropriate given the minimal laboratory and clinical findings, and no other source for her allegations of disabling or marked pain has been investigated or documented. … Dr. Alappatt's records document significantly less severe complaints of pain [than] the claimant alleged at her hearing.

9

(Tr. 23-24).   The ALJ explained her reasons for giving Dr. Alappatt's opinions only "moderate" weight:

> Dr. Alappatt, a treating arthritis specialist completed a check-box form and indicated that the claimant exhibited reduced grip strength and that she could rarely lift 10 pounds. (Exhibit 6-F).  He also indicated that the claimant was limited in her ability to stand and walk, which is accounted above, but also noted that she would be absent from work more than four days per month.  Dr. Alappatt's records do not document reduced grip strength and the only basis for that finding is the subjective complaints of the claimant as there is no grip strength testing noted in Dr. Alappatt's records.  In addition, he provided no basis why the claimant was significantly limited in her ability to stand and walk, which is particularly questionable in light of the minimal clinical findings and the claimant's expressed love of being outdoors, walking, and going to the park…. In addition, his indication that the claimant could frequently climb stairs [is] inconsistent with his overall limitations.  His conclusion that the claimant would miss four days of work per month is speculative, at best, and given the lack of significant clinical findings and low rheumatoid activity levels documented on testing, can only be based on an unquestioned acceptance of the claimant's subjective allegations.  Finally the record provides no basis for his limiting the claimant to no more than four hours of sitting per workday.  While the claimant does exhibit some mild clinical findings of rheumatoid arthritis, those observations in no way support the limitation to less than full-time work activity at any exertional level. The findings documented in Dr. Alappatt's records are fully taken into account in the above-described residual functional capacity.  Therefore, his assessment is entitled to at most moderate weight to the extent that the claimant does experience some mild limitations in standing and walking, but not beyond a combined total of four hours.

(Tr. 25-26).

Plaintiff first argues that the ALJ erred by not fully aligning her physical RFC findings with any consulting or treating physician's assessment.  However, the ALJ's RFC determination will be affirmed as long as it is supported by substantial evidence, even if it does not completely align with a specific medical opinion.  *See Poe v. Com'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("An ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical

evidence before rendering a residual functional capacity finding," and "is not required to recite the medical opinion of a physician verbatim" in his RFC finding).

In a related argument, Plaintiff reasons that if the ALJ gave Dr. Alappatt more weight than given to other physical RFC opinions, then the ALJ must have followed SSR 96-2p and given the "most weight" to that treating physician. She continues that if the ALJ gave Dr. Alappatt the "most" weight, then the ALJ must have given him "controlling weight" and should have adopted all of the limitations that he endorsed.

Plaintiff's logic is flawed.  Contrary to her faulty premise, it is entirely possible (as occurred here) for an ALJ to give greater weight to one opinion over another, without giving that opinion "controlling" weight.  Although SSR 96-2p provides policy guidance consistent with regulations that require an ALJ to give controlling weight to treating physicians; it does not deviate from those regulations.  Thus, controlling weight will not be given to a treating source "unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  SSR 96-2p, 1996 WL 374188.  Here, the ALJ explained why she did not find Dr. Alappatt's opinions to be well-supported.  The ALJ further explained why she rejected opinions that were contradicted by other substantial evidence in the record.  The ALJ provided good reasons for her analysis.

Plaintiff protests that the ALJ ignored clinical records that supported Dr. Alappatt's opinions.  In her reply memorandum, she references "11 instances of swelling on exams," contrary to the ALJ's finding that Dr. Alappatt never found any swelling.  However, Plaintiff's references (Doc. 10 at 2; Doc. 5 at 4) are not supported by the record.  The cited pages do not contain any findings of swelling but instead refer only to Dr. Alappatt's findings of "crepitus" in Plaintiff's knees.  (*See, e.g.,* Tr. 433, 436,

442, 445, 451, 454, 457, 460, 667, 821). All of the cited pages reflect objective findings of "no edema" and all but one page reflects examination findings of "full, painless range of motion of all major muscle groups and joints." (*Id.*) The lone page that noted some pain still found no edema, and essentially "normal labs." (Tr. 821). While Dr. Alappatt sometimes noted Plaintiff's *subjective* reports of swelling and stiffness (in contrast to his objective findings), he noted that Plaintiff denied swelling and stiffness on other occasions. (*Compare, e.g.,* Tr. 444 ("ankles occasionally swell") with Tr. 441 ("denies joint pain or swelling") and Tr. 450 ("hasn't been much joint swelling.")).

Plaintiff also claims that the crepitus in her knees supports Dr. Alappatt's limitations on her ability to stand and walk. However, crepitus alone does not support such extreme limitations, particularly given objective findings of a lack of tenderness, lack of swelling, and consistently full and painless range of motion as noted.

Plaintiff points to two 2014 records where she reports neck and/or shoulder pain. (Tr. 821, 750). However, that pain was not related to rheumatoid arthritis, which was "in excellent control," but instead to a "pain syndrome" that was unsupported by findings on x-ray. (Tr. 750). Dr. Alappatt noted she had failed PT for this complaint and recommended pain management, such as epidural or botox injections, although there is no evidence that Plaintiff pursued that recommendation. (*Id.*).

Last, Plaintiff points to her reported fatigue as supporting Dr. Alappatt's proffered restrictions on her ability to sustain full-time work. If this were Plaintiff's only claim of error, the undersigned would have no difficulty finding any error to have been harmless, as the ALJ's consideration of Dr. Alappatt's physical RFC opinions is generally supported by substantial evidence. However, because errors concerning the evaluation of Plaintiff's mental impairments and credibility may have impacted the ALJ's analysis of

Plaintiff's physical pain complaints and fatigue, the ALJ should reconsider the evaluation of Plaintiff's physical RFC limitations on remand.

### 2.  Plaintiff's Mental RFC Limitations

Two of Plaintiff's claims focus on the mental limitations determined by the ALJ. First, Plaintiff argues that the ALJ erred by giving "significant weight" to consultants who offered mental RFC opinions, but then not adopting a critical work restriction.[3]  Second, Plaintiff argues that the ALJ erred by failing to give controlling weight to the mental RFC opinions offered by her treating psychiatrist, Dr. Alice Onady, who completed mental RFC forms in April 2013 and in July 2014.

### a.  The Consulting Mental RFC Opinion

On July 9, 2013, non-examining psychologist Tonnie Hoyle, Psy.D., found mild restriction in Plaintiff's activities of daily living, but moderate restrictions in social functioning and in concentration, persistence or pace, with no episodes of decompensation of extended duration. (Tr. 97, 112).  Dr. Hoyle determined that Plaintiff "retains the ability to complete 3-4 step tasks in an environment where changes are infrequent, where pace is not fast, and where there are no strict production quotas."  (Tr. 101, 116).  Dr. Hoyle opined that Plaintiff's ability to interact with the general public was moderately limited, as were her ability to accept instructions and to respond appropriately to criticism from supervisors, and her ability to respond appropriately to changes in the work setting.  Despite overall "moderate" limitations, Dr. Hoyle opined that Plaintiff should "work with supportive supervision in a setting free from requirements of social interaction."  (Tr. 101).

---

[3]The undersigned was unable to verify the existence of a second psychological consultant from the record.  Both Exhibits 5A and 6A contain the opinions of Dr. Hoyle.

### b.  Dr. Onady's April 2013 and July 2014 Mental RFC Opinions

Plaintiff began receiving mental health treatment from Comprehensive Behavioral Health in September 2011.  She saw several counselors over time whose records were carefully reviewed by the ALJ, even though they are not considered to be acceptable medical sources.   In November 2011, Plaintiff began seeing Dr. Alice Onady, a psychiatrist at the same practice.

As Plaintiff's treating psychiatrist, Dr. Onady completed two separate check-box mental RFC forms.  On an April 2013 form, she opined that Plaintiff would be unable to meet competitive standards in multiple areas, including but not limited to the ability to sustain a work routine without special supervision, to complete a normal workday and workweek, perform at a consistent pace without unreasonable rest periods, or deal with normal work stress. (Tr. 540).   Dr. Onady opined that Plaintiff would be easily overwhelmed by her fear of new places, and would miss more than four days of work each month.  (Tr. 543).  She listed Plaintiff's diagnoses as including major depression (severe), PTSD, general anxiety disorder, and severe emotional medical and financial stress.  (Tr. 538).  She assessed Plaintiff's current Global Assessment of Functioning ("GAF") score at "35" reflecting major impairment, and consistent with a complete inability to work.  She assessed Plaintiff's highest GAF in the past year at "40."  Dr. Onady reported her patient's response to treatment was only "fair."  She stated that Plaintiff had "marked" impairment in maintaining social functioning, one or two episodes of decompensation of at least two weeks duration, and "moderate" difficulties in the two other "paragraph B" functional areas of activities of daily living and maintaining concentration, persistence or pace.  (Tr. 541).

14

On July 15, 2014, Dr. Onady completed a second mental RFC form with similar work-preclusive limitations. However, on the second form she reduced to "moderate" Plaintiff's limitations in social functioning, but increased to "marked" her restrictions in activities of daily living, with similar moderate findings on concentration, persistence and pace,[4] and in episodes of decompensation found in April 2013. (Tr. 804). The diagnoses listed in July 2014 substituted agoraphobia with panic attacks in place of PTSD, also listing major depression, general anxiety disorder, and "severe [illegible] medical and emotional stressors." (Tr. 801). Again, Dr. Onady stated Plaintiff's response to treatment was only "fair," with a current and "highest" GAF score of 40. (*Id.*)

### c. The ALJ's Evaluation of Mental RFC Opinion Evidence

The mental RFC limitations found by the ALJ were consistent with Dr. Hoyle's consulting opinions, except that the ALJ declined to include a restriction to supportive supervision without any social interaction. Of note, the same limitation was endorsed by Dr. Onady. The ALJ reasoned that the restriction was "inconsistent with [the] finding of 'moderate' limitation in social functioning." (Tr. 24). While the ALJ limited Plaintiff to jobs that did not involve "contact with the public," she found Plaintiff could have "occasional contact with coworkers and supervisors." (Tr. 20).

To excuse the failure to adopt the referenced restriction, the Defendant cites to the "forgiving standard" of the low deference owed to non-examining consultants. (Doc. 9 at 10). However, the ALJ's basis for rejecting the limitation to work with "supportive supervision in a setting free from requirements of social interaction" was not reasonable,

---

[4]In 2014, Plaintiff's ability to maintain concentration, persistence or pace was slightly upgraded to "seriously limited but not precluded." (Tr. 803).

and is not supported by substantial evidence.  Both consulting and treating providers noted at least moderate limitations in Plaintiff's ability to respond to changes in the work setting and normal work stress, which limitations presumably led to their shared opinion that Plaintiff requires "supportive supervision."  The ALJ does not explain how "moderate" limitations in social functioning are incompatible with that restriction.

Likewise, the undersigned is not persuaded by the ALJ's cursory rationale that moderate social limitations are incompatible with a work restriction "free from" social interaction. The ALJ relied on Plaintiff's "ability to maintain stable relationships with her daughter and mother, a long-term relationship with her fiancé, and her presentations and behavior during treatment sessions" as "not consistent with a preclusion of all socialization in the workplace."  (Tr. 24).  However, long term familial relationships that predate Plaintiff's alleged disability, or relationships with her medical providers, are not equivalent to the type of social interactions that Plaintiff would encounter in the workplace.  The ALJ also cited Plaintiff's past work history as suggesting "no innate issues in dealing with people."  (Tr. 24).  But Plaintiff never testified she had "innate fear or dislike of others." (Tr. 19, emphasis added).  The fact that Plaintiff was once able to work as a waitress (at a time she claimed no disabling psychological symptoms) should not have been used as evidence that she has not developed such symptoms over time.

I conclude that the ALJ's failure to include the referenced limitation constitutes reversible error, and requires remand for further development of the record.

Plaintiff also argues that the ALJ erred in failing to give "controlling weight" to additional work-preclusive limitations found by Dr. Onady, arguing that the ALJ failed to provide "good reasons" for rejecting Dr. Onady's opinions.    Although there is support in

the record for some of the ALJ's stated reasons for rejecting Dr. Onady's opinions, other portions of the ALJ's analysis are more problematic.

For example, the ALJ criticized Dr. Onady's visits as being "brief" – presumably referring to the standard half hour appointment, with some appointments even shorter. (Tr. 26).  However, the length of the appointments appears to be fairly standard for medication management visits to a psychiatrist.  Also of concern is the ALJ's comment that Dr. Onady "may be relying heavily on the claimant's subjective complaints of panic attacks and other emotional distress," even though "no source has witnessed a so-called panic attack…."  (Tr. 26).  Rejecting a psychological or psychiatric opinion *solely* on the basis that it relies upon "subjective complaints" is generally disfavored, considering that interviews are used as an acceptable diagnostic technique in the area of mental impairments.  *See Warford v. Astrue*, 2010 WL 3190756 at *6 (E.D. Ky., Aug. 11, 2010).  Mental impairments are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment," and the diagnostic techniques employed in the field of psychiatry "may consist of the diagnosis and observations of professionals trained in the field of psychopathology."  *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989).

Despite these less than optimal explanations, other reasons for discounting Dr. Onady's opinions were better supported.  For example, the medication regimen prescribed by Dr. Onady appeared to "control the claimant's symptoms in general with no changes noted in signs, symptoms, or impairment" with "no significant mental health concerns" noted.  (Tr. 26).  Additionally, the ALJ reasoned that Dr. Onady's opinion that Plaintiff's anxiety resulted in her

> complete inability to function independently outside the home is not supported by the record and is not consistent with the claimant going to an

17

> amusement park and on a trip to Tennessee without mental issues.  In addition…the claimant reported that she loved to be outdoors, go to the park, and walking and she testified she drives once or twice a week.  In addition although the claimant reported that she loved to read because it calms her mind, Dr. Onady provided no explanation why she could not perform carry out detailed instructions….Dr. Onady also indicated that the claimant experienced one or two episodes of extended decompensation, but the record documents no such episodes.

(Tr. 26-27).

Plaintiff cites to select records such as modest evidence of PTSD (which the ALJ did not find to be a severe impairment) and her diagnosis of agoraphobia with panic attacks (which was found to be a severe impairment) to support several of Dr. Onady's opinions.  Plaintiff also takes issue with the ALJ's reliance on her trips to Kings Island and Gatlinburg, arguing that such references do not take into account her most symptomatic days, or difficulties encountered on one trip in June 2012.  (*See, e.g.*, Tr. 529, reporting frustration with arthritis on a trip to Kings Island on a date that she was "in so much pain, she couldn't enjoy it and nearly had a panic attack.").  However, an ALJ need not discuss every piece of evidence in the record.  *See Kornecky v. Com'r*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) (citing *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436,454 (6th Cir. 1999)).  In addition, in the same June 2012 record, Plaintiff reported that "overall" her anxiety was "remaining low, except when she is in a lot of pain from her medical condition." (*Id.*)  She discussed her desire to work despite her physical limitations, and "responded well to the therapist's discussions with her about changing her outlook and possibly taking to a career or college counselor about her career options."  (*Id*).  Just two months later in August 2012 Plaintiff reported "doing much better."  (Tr. 524).  She had returned to Kings Island and was able to go on rides, which she previously had identified as a treatment goal.  She reported no recent panic attacks and that she had "been doing great regarding her anxiety."  (Tr. 524).

18

Plaintiff criticizes the ALJ's reference to a trip she took to Gatlinburg on grounds that the ALJ failed to ask if she had limitations on that trip.  However, Plaintiff was represented by counsel, and it remained her burden to prove disability.  An ALJ has no duty to point out every inconsistency in the record at the time of the hearing.

Notwithstanding the recommended remand of this case, many of Plaintiff's records support the non-disability determination.  For example, beginning with her initial diagnostic assessment interview on September 14, 2011 prior to treatment, Plaintiff reported that her fear of panic only "sometimes…prevents her from going out in public." In that same assessment, she reported strong familial relationships, two close friendships, and that she "enjoys walks and going to the park," and "likes being outdoors."  (Tr. 584).  She wanted a job, but had been unable to find one.  (Tr. 585). Her GAF score was assessed at 55, reflecting no more than moderate symptoms.  (Tr. 17).

Nearly a year later, Plaintiff underwent a second assessment to gauge the effectiveness of her treatment.  In contrast to Dr. Onady's unsupported assessment of only "fair" response and unabated debilitating symptoms, on August 29, 2012, Plaintiff reported a "demonstrated significant improvement regarding her reported symptoms." (Tr. 351).  She reported a "very minimal" level of anxiety, with no recent panic attacks, and a regained ability "to live her life as she wants to including being able to drive on the highway and ride things at Kings Island again."   (Tr. 351).  She reiterated her desire to get a job but that she had not been able to secure one.  (*Id.*).  By the time of her second assessment, her diagnosis was changed to anxiety alone and her GAF score had improved to 70.  (Tr. 18).  Other records similarly portray relatively mild symptom.  (*See e.g.*, Tr. 521, 8/29/12 note that Plaintiff feels "much better," "responded well" to therapy,

19

with anxiety "stable"; Tr. 410, "been doing great regarding her anxiety."; Tr. 505, 2/15/13 note reporting Plaintiff feels "good" with "very little depressive symptoms"; Tr. 696, noting that Plaintiff joined a church).  Records suggest that Plaintiff took two trips to Gatlinburg, Tennessee in 2014.  (*See* Tr. 760, 762).

Plaintiff's last mental RFC argument concerns the ALJ's restrictions to "simple, repetitive tasks" and to "low stress work…defined as no strict production quotas or fast pace and only routine work with few changes in the work setting."  She contends such restrictions are inadequate to account for her "moderate" level of impairment in concentration, persistence and pace.  The undersigned finds no error under *Ealy v. Com'r*, 594 F.3d 504, 515-517 (6th Cir. 2010), and declines to adopt the non-binding Seventh Circuit's analysis in *O'Connor-Spinner v. Com'r of Soc. Sec.*, 832 F.3d 690 (7th Cir. 2016).  In *Ealy*, the restriction was inadequate because the ALJ had adopted but then failed to account for a specific hourly limitations.  Many post-*Ealy* decisions have confirmed that in cases like this one, which do not include such hourly restrictions, a limitation to simple, repetitive tasks is sufficient to accommodate a moderate impairment in concentration, persistence, and pace.  *See, e.g., Hicks v. Com'r*, Civil Case No. 1:13-cv-425-SJD, 2014 WL 4748356 at *6 (R&R adopted Sept. 23, 2014); *Suesz v. Com'r*, 2014 WL 4162555 at *6 (R&R adopted Aug. 20, 2014).

### 3.  The ALJ's Credibility Assessment

Plaintiff next asserts that the ALJ erred in assessing her subjective complaints as "not entirely credible."  (Tr. 21).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Com'r of Soc.*

*Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387.

The ALJ noted specific inconsistencies between Plaintiff's asserted difficulty using her hands for tasks such as opening bottles and using buttons and zippers, and Dr. Alappatt's clinical records that documented few objective findings.  (Tr. 21, 23). Further, the ALJ found Plaintiff's statements concerning her pain level and other symptoms to be "far in excess of mild clinical and objective findings of record."  (Tr. 23). She noted that "Dr. Alappatt's records document significantly less severe complaints of pain than the claimant alleged at her hearing."  (Tr. 24).

Similar to the ALJ's assessment of Plaintiff's mental impairments, the ALJ's credibility assessment, while partially supported by the record, provides some cause for concern.  For example, the ALJ suggested that Plaintiff had improved to the point that she had been discharged from mental health treatment in August 2012, (Tr. 22), citing the assessment showing "significant improvement."  However, the cited record does not state that Plaintiff has been discharged from treatment, but reflects a "transfer" or "change in type of service," with an accompanying change in diagnosis.  (Tr. 811, 812). The record states "Goal 1 not met," and reflects Plaintiff's desire to continue treatment. (Tr. 812).  Another factual error appears in the context of a discussion concerning Plaintiff's medications, where the ALJ states that "there is no indication of fatigue or daytime somnolence."  (Tr. 23).  Plaintiff reported that her medicine causes insomnia

and Dr. Alappatt's records consistently confirm fatigue.  Dr. Onady also refers to her being "overwhelmed with pain and fatigue."  (Tr/ 512).

The ALJ seemed to question the reliability of Plaintiff's reports to her clinicians of "so-called panic attacks" and isolation as without "verification."  (Tr. 22).  However, there is no evidence in the record that Plaintiff did not experience those symptoms, which were consistently noted (including in records in which Plaintiff denied recent panic attacks).  Her reported symptoms formed the basis of her diagnosis of agoraphobia with panic attacks, which the ALJ accepted as a severe impairment.  Additionally, the regulations do not appear to support discounting credibility on the basis that "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (Tr. 24).

In support of a more favorable finding, Plaintiff points to RFC forms on which Drs. Alappatt and Onady checked boxes indicating she was not a malingerer and that her impairments were reasonably consistent with her symptoms.  (Tr. 533-534, 543).  Dr. Onady also opined that Plaintiff's mental impairments cause her to subjectively feel more pain than might otherwise be supported by objective findings.  (Tr. 804, noting that depression and anxiety "can make RA pain worse," and that Plaintiff is "easily overwhelmed by her fears of new places [and] situations [and] retreats to her home [and] bed.").

If the credibility errors noted were the sole errors in this record, the undersigned might be inclined to view them as harmless, particularly given the deference owed to the ALJ in this area and the existence of some evidence that supports the ALJ's assessment.  However, the referenced errors cannot be brushed away as *de minimis* on the record presented.

### 5. Alleged Error in Hypothetical to VE

For her fifth claim, Plaintiff argues that the hypothetical questions posed to the VE do not constitute substantial evidence for the non-disability determination made in this case. To the extent stated above, I agree.

### 6. Plaintiff's final argument concerning date of onset

While not articulated as a separate claim of error, Plaintiff includes a short argument at the end of her brief that the ALJ erred in finding no severe impairments existed prior to April 27, 2011, which was the first date that Plaintiff began any diagnostic testing for her rheumatoid arthritis. Plaintiff cites to SSR 83-20 in support of an argument that an onset date "can" be set prior to receipt of medical treatment. However, when Plaintiff first was examined by Dr. Alappatt in May 2011, she reported no more than a three-month history of joint pain. (Tr. 428). And, although Plaintiff testified that she first experienced symptoms of depression or anxiety after leaving her waitress job in 2008, she does not allege any disability prior to February 2010, and she submitted no evidence that she sought any treatment for her psychological symptoms prior to September 2011. To the extent that Plaintiff's relatively cursory argument is considered, it is rejected because the ALJ's determination of the date of onset of "severe" impairments is supported by substantial evidence.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **REVERSED AND REMANDED** under sentence four, for further development of the record consistent with this report and recommendation, that

judgment be entered, and that this case be **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SACHA B. DAUGHERTY,                          Case No. 1:16-cv-898

           Plaintiff,                          Dlott, J.
                                                      Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).